## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FBI WIND DOWN, INC. (F/K/A FURNITURE BRANDS INT'L, INC.), *et al.* | ) ) | Case No. 13-12329 (CSS) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| FBI WIND DOWN INC. LIQUIDATING TRUST, BY AND THROUGH ALAN D. HALPERIN, AS LIQUIDATING TRUSTEE, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 15-51899 (CSS) |
| | ) | |
| HERITAGE HOME GROUP, LLC, *et al.* | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

### OPINION[1]

BLANK ROME LLP
Michael B. Schaedle
Victoria A. Guilfoyle (DE No. 5183)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:    (302) 425-6400
Facsimile:    (302) 425-6464

-and-

HAHN & HESSEN LLP
Mark T. Power

RICHARDS, LAYTON & FINGER, P.A.
Michael J. Merchant (No. 3854)
Robert C. Maddox (No. 5356)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

-and-

PAUL, WEISS, RIFKIND, WHARTON

---

[1]    The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions or law constitute findings of fact, they are adopted as such.

Robert J. Malatak                        & GARRISON LLP
Stephen J. Grable                        Allan J. Arffa
488 Madison Avenue                       Ross. A. Wilson
New York, New York 10022                 1285 Avenue of the Americas
Telephone:    (212) 478-7200             New York, New York 10019-6064
Facsimile:    (212) 478-7400             Telephone:    (212) 373-3000
                                         Facsimile:    (212) 757-3990


Dated: September 15, 2016

Sontchi, J. _____

## INTRODUCTION

Before the Court is a motion to compel the arbitration of several claims in this adversary proceeding.  Heritage Home Group LLC ("*Heritage*"), the movant, purchased substantially all of the Debtors' assets pursuant to a Sale Order approved by this Court on November 22, 2013.[2]  The Second Amendment to the Asset Purchase Agreement (the "*Second Amendment*" and the "*APA*") required Heritage and the Sellers to engage in a purchase price reconciliation process in the sixty days after Closing.[3]  The parties were unable to agree on the proper purchase price reconciliations.[4]  As a result, the Trustee, as successor-in-interest to the Sellers, filed this adversary proceeding.  The Trustee asserts that, under the purchase price reconciliation provisions in the APA, Heritage owes the Liquidating Trust approximately $13,000,000.[5]  Heritage denies the Trustee's accounting and asserts that the Liquidating Trust owes Heritage approximately $8,000,000.[6]  The merits of the parties' dispute are not yet under consideration because § 3(a) and § 3(b) of the Second Amendment, which govern the reconciliation process, each contain an Accounting Arbitration Clause (the "*Arbitration Clause*").[7]

The parties have raised two disputes that might be subject to mandatory arbitration.  First, the parties dispute whether Heritage has the right to retain "Auction Clearing House Electronic Receipts & Deposits" ("*ACHE-R/D*") earned by the Sellers shortly

---

[2]   Case No. 13-12329, D.I. 833 (the "*Sale Order*").

[3]   *See* Case No. 15-51899, D.I. 1, Ex. A (the "*APA*").

[4]   *See* Case No. 15-51899, D.I. 1, pp. 1-2, ¶¶ 1-4 (the "*Trustee's Complaint*").

[5]   *Id.* at p. 4, ¶ 7(b).  The Trustee also raises several other claims which are not subject to any arbitration provision and therefore are not further discussed in this holding.

[6]   *Trustee's Complaint*, Ex. E at ¶ 4 (Heritage's Second Amended Request for Payment of Administrative Expense Claims).

[7]   *Trustee's Complaint* at Ex. E, pp. 6-7 (the "*Second Amendment to the APA*" or the "*Second Amendment*"). Section 3(a) and § 3(b) govern two different parts of the post-Sale purchase price reconciliation and each section contains its own Arbitration Clause.  The texts of these two Arbitration Clauses, however, are identical.  For purposes of clarity and simplicity, the Court hereafter refers to these Arbitration Clauses in the singular—the "Arbitration Clause."

before Closing.[8]  Second, the parties dispute what accounting method—GAAP or the Sellers' traditional practices—must be applied in calculating the purchase price reconciliations.[9]

Heritage asserts that, under § 3(a) and § 3(b) of the Second Amendment, these disputes must be submitted to the Accounting Arbitrator for resolution.[10]  In response, the Trustee argues that this Court must first determine several "threshold legal issues" before these claims may be submitted to arbitration.[11]  The Trustee asserts that the issues raised in his Complaint (1) are outside the scope of the Arbitration Clause and (2) are issues over which the Court expressly retained jurisdiction in the Sale Order.[12]

The Court interprets the Arbitration Clause as follows: (1) disputes over the *calculation* of reconciliation items, including disputes over *how* a set of accounting principles must be applied, are arbitrable while (2) disputes over the interpretation of the APA, including disputes over what rules the APA places on the Accounting Arbitrator, are not arbitrable. The Court has determined that this interpretation is the most reasonable—and only reasonable—interpretation after engaging in a three-step interpretative process.

First, the Court examined the text and structure of the Arbitration Clause to determine what restrictions, if any, limit the scope of the Arbitration Clause.  The Court sees two clear restrictions: (1) only disputes relating to the reconciliation provisions of § 3(a) and § 3(b) of the Second Amendment are arbitrable, but (2) not *all* disputes relating to the reconciliation provisions are arbitrable.  Second, the Court determined that because

---

[8]   This dispute, on its merits, consists of two questions: (1) did Heritage acquire title to the ACHE-R/D as part of the Sale and (2) was Heritage required, as part of the Sale, to pay the Sellers cash equal to the value of the ACHE-R/D acquired?

[9]   This dispute, on its merits, consists of three questions: (1) should the Sellers' prepayments to vendors be classified as a reduction against Accounts Payables or as an asset; (2) should deposits by customers be classified as a credit against Accounts Receivable or as Accounts Payable Obligations; and (3) should Accounts Payable Obligations be calculated on an actual or accrual basis?

[10]   *Heritage's Brief in Support*, Case No. 15-51899, D.I. 14, pp. 1-2.

[11]   *Trustee's Response Brief*, Case No. 15-51899, D.I. 30, pp. 5-6.

[12]   *Id.*

4

"item" is a term of art in accounting, "any disputed item," as used in the Arbitration Clause, was a limiting term that restricted the scope of the Arbitration Clause to disputes over "accounting items." Third, the Court examined whether this interpretation (1) caused conflict with any supporting documents and (2) appeared to be an outcome which two sophisticated parties could reach an agreement on after arms-length negotiation.

Finally, the Court examined the parties' disputes to determine if either dispute falls within the narrow scope of the Arbitration Clause. Because both disputes are clearly disputes over the proper interpretation of the APA, the Court finds that neither dispute is arbitrable. As a result, the Court denies Heritage's motion to compel arbitration.

## JURISDICTION

The United States Bankruptcy Court for the District of Delaware (the "Court") has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. § 1409(a). This action was brought as an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001.

## BACKGROUND

Furniture Brands International, Inc. and a number of its affiliates[13] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 9, 2013.[14] These cases were procedurally consolidated and jointly administered pursuant to Bankruptcy Rule 1015(b). On the Petition Date, the Debtors filed a motion (the "*Sale Motion*") seeking authorization to sell substantially all of their assets to affiliates of Oaktree Capital Management, L.P. ("*Oaktree*") and approval to enter into an Asset

---

[13] The "*Debtors*." Some Debtor entities did not make any transfers under the Sale. The "*Sellers*" refers specifically to those Debtor entities that transferred assets in the Sale.

[14] Case No. 13-12329, D.I. 1.

Purchase Agreement between the Debtors and Oaktree (the "*Oaktree APA*").[15]   The Oaktree APA provided that Oaktree would purchase substantially all of the Debtors' assets for $166,000,000.[16]   Concurrently, the Debtors also filed a motion (the "*DIP Financing Motion*") seeking entry of interim and final orders authorizing the Debtors to obtain senior secured post-petition financing on a super-priority basis in an amount up to $140,000,000 from Oaktree.[17]

The Court held the First Day Hearing on September 11, 2013.[18]   KPS Capital Partners, LP,[19] ("*KPS*") appeared at the First Day Hearing and submitted an alternative proposal to provide the Debtors with post-petition financing and to be considered the stalking horse bidder.   KPS offered to purchase substantially all of the Debtors' assets for a purchase price of $225,000,000.[20]   In response, Oaktree substantially improved the terms of its proposal.   At the conclusion of the First Day Hearing, the Court entered an interim order approving the DIP Financing Motion with Oaktree as DIP Lender.[21]

Prior to the entry of a bid procedures order, the Debtors and the Committee negotiated with both Oaktree and Heritage/KPS to obtain better offers for the Debtors' assets.   Ultimately, Heritage made a proposal to purchase substantially all the Debtors' assets for a total purchase price of $280,000,000, plus other consideration, and for KPS to provide up to $190,000,000 in DIP Financing.[22]   On October 2, 2013, the Debtors and Heritage entered into the APA.[23]

---

[15]   *See Trustee's Complaint* at ¶ 23.

[16]   *Id.*

[17]   *Id.* at ¶ 24.

[18]   *Id.* at ¶ 25.

[19]   KPS is a Defendant in this adversary proceeding and is the ultimate parent of Heritage.

[20]   *Id.*

[21]   *Id.*

[22]   *Id.* at ¶ 26.

[23]   *Id.* at ¶ 27.

On October 3, 2013, the Court held a hearing on the DIP Financing Motion and the Sale Motion.[24]  At the conclusion of that hearing, the Court approved the DIP Financing Agreement with KPS and selected Heritage to be the stalking horse bidder in an auction sale for substantially all of the Debtors' assets.[25]   On November 5, 2013, the parties executed Amendment No. 1 to the APA.[26]  On November 22, 2013, the parties executed Amendment No. 2 to the APA.[27]  Later that day, the Court held a hearing on the Sale Order; at the conclusion of that hearing, the Court entered an order approving APA and the Sale (the "*Sale Order*").[28]  The Sale closed at 12:01 a.m. EST on Monday, November 25, 2013 (the "*Closing Date*").  On July 14, 2014, the Court entered an order that: (1) confirmed the Debtors' Second Amended Joint Plan of Liquidation; (2) established the Liquidating Trust; and (3) appointed the Liquidating Trustee to wind down the Debtors' estates.[29]

The APA, as amended, was designed with a single goal in mind—to transfer the Sellers' operating businesses at a fixed price.  As the Trustee explains, achieving such a goal was difficult because "while the Debtors' 'cash and cash equivalents' remained Excluded Assets, Heritage was acquiring the Debtors' infrastructure and cash management systems, including the Debtors' physical bank accounts."[30]  Sections 3(a) and 3(c) of the Amended Asset Purchase Agreement set forth a complex mechanism meant to ensure that the transfer of the Sellers' cash management system did not result in (1) Heritage acquiring any of the Sellers' "Excluded Assets" and (2) Heritage did not assume any more of the Sellers obligations than as bargained for in the APA.

---

[24]   *Id.*

[25]   *Id.*

[26]   *Trustee's Complaint* at Ex. D

[27]   *Trustee's Complaint* at ¶ 32.

[28]   *Id.* at ¶ 33.

[29]   *Id.* at ¶ 14

[30]   *Trustee's Response Brief* at p. 8.

As previously noted, the Sellers' cash and cash equivalents were an "Excluded Asset" being retained by the Sellers. Removing all the cash from the Sellers' Bank Accounts, however, would disrupt ongoing operations and therefore was not a feasible option. Sections 3(a) and 3(c) of the Second Amendment laid out a process to deal with this issue. First, § 3(a) required the Sellers to, at least one business day prior to the Closing Date, submit to Heritage an estimate of (1) the "Closing Cash"[31] in the "Acquired Bank Accounts." Section 3(c) provided that the cash amount payable at the Closing would be increased on a dollar-for-dollar basis by the estimated Closing Cash. These two provisions provided a simple solution to the parties' primary problem. Heritage would acquire both the Sellers' Bank Accounts and the cash in those accounts, but because the cash was an Excluded Asset, Heritage would transfer an equivalent amount of cash to the Sellers at Closing. This was not a "purchase price adjustment." It was a "cash component adjustment" used to ensure that the aggregate purchase price remained fixed at $280,000,000.

This process, however, involved an estimate. If the Sellers had overestimated the Closing Cash, then Heritage would have paid more than the agreed-upon $280,000,000 purchase price. If the Sellers had underestimated Closing Cash, then Heritage would have paid less than the agreed-upon $280,000,000 purchase price. As a result, § 3(a) of the Second Amendment required the parties to mutually determine the "Actual Closing Cash" within sixty days after Closing. If the estimated Closing Cash was greater than Actual Closing Cash, then § 3(a) required the Sellers to return to Heritage the excess. If the Actual Closing Cash was greater than the estimated Closing Cash, then § 3(a) required Heritage to pay the Sellers the deficit.

Transferring the Sellers's Bank Accounts also posed a secondary issue: checks[32] were constantly being issued and received. Usually, however, there is a delay between a check

---

[31] Including "cash… and all cash equivalents and marketable and other securities." *Second Amendment to the APA* at p. 6.

[32] And check equivalents.

being issued and cash by the recipient, and between a check being cashed and the amount actually being attributed to the recipient's account. This created two problems at Closing. First, the Sellers were responsible for any checks issued prior to closing, but some of these checks would not be cashed by the recipients until after Closing. Second, some checks and payments sent to the Sellers prior to Closing would not be reflected in the Sellers' Bank Accounts until after Closing.

Section 3(a) provided solutions to both problems. First, § 3(a) required the Sellers to, within one day of Closing, submit an estimate of the "Check Amounts in Transit" leaving each Acquired Bank Account. Section 3(a) then required the Sellers to place, in each Acquired Bank Account, sufficient cash (the "Check Amount in Transit Cash") to cover the estimated "Check Amounts in Transit" for each account. Again, this was an estimate. As a result, Section 3(a) required the parties to, within 60 days of Closing, determine the Actual Check Amounts in Transit. Again, depending on whether the Sellers under- or overestimated, one party would be required to pay the other. Finally, § 3(a) required the parties to determine, within sixty days of Closing, the amount of transfers going into the Acquired Bank Accounts prior to Closing that were not reflected in the balance of the accounts until after Closing (the "Cash Amounts in Transit"). Section 3(a) then required Heritage to pay to the Sellers' an amount equal to the Cash Amounts in Transit.

Section 3(b) was designed to handle another difficulty in achieving a fixed purchase price at closing—payment of the Sellers' short-term trade debt (the "*Accounts Payable Obligations*" or "*AP*"). In the original APA, Heritage agreed to assume up to $10,000,000 of the Sellers' Account Payable Obligations (the "*AP Cap*"),[33] subject to three requirements: (1) the obligation arose post-petition; (2) the obligation related solely to the

---

[33]    In the original APA, Accounts Payable Obligations was not a defined term. Section 2.3(a)(ii) instead included "trade payable obligations in an amount not to exceed $10,000,000 in the aggregate."

Acquired Assets; and (3) the obligation were allowed under § 503(b)(1) of the Bankruptcy Code.[34]

The Second Amendment to the APA both clarified and reduced this obligation. First, Accounts Payable Obligations became a defined term.[35] Second, § 2.3(a)(ii) of the APA was amended and the AP Cap was lowered to $9,000,000; unchanged, however, were the three additional requirements discussed above.[36] Finally, the reconciliation provisions and Arbitration Clause of § 3(b) were incorporated into the APA.[37]

Section 3(b) laid out a straightforward process for determining whether the AP cap had been exceeded. First, § 3(b) required the Sellers to, no later than one business day before the Closing Date, submit an estimate of their Accounts Payable Obligations (the "*Estimated AP*"). At Closing, the cash paid by Heritage to the Sellers would be reduced on a dollar-for-dollar basis by the amount, if any, by which the Estimated AP exceeded the AP Cap. In parallel with § 3(a), § 3(b) contained a reconciliation provision. Section 3(b) required the parties to, within 60 days of Closing, calculate what the Sellers' Actual AP at closing. If Estimated AP exceeded Actual AP, Heritage would pay the Sellers the difference. If Actual AP exceeded Estimated AP, the Sellers would pay Holdings the difference.

Alan D. Halperin, as Liquidating Trustee (the "*Trustee*") for the FBI Wind Down Inc. Liquidating Trust (the "*Liquidating Trust*") filed this adversary proceeding on November

---

[34] *APA* § 2.3(a)(ii).

[35] "'<u>Accounts Payable Obligations</u>' shall mean the Sellers' accounts payable obligations incurred for the period prior to closing that are 503 Liabilities accounted for in the Sellers' books and records under the accounts 22100, 22180, 22181 and 22990 referenced in Exhibit 2.3(a)(ii) to this Amendment plus accounts payable obligations related to the purchase of goods or services incurred by the Sellers prior to Closing (including accounts payable obligations related to goods for which title has passed to the Sellers prior to the Closing) that are not captured in the aforementioned accounts…" *Second Amendment to the APA* at p. 2, § 2(a).

[36] *Id.* at p. 3, § 2(e).

[37] *Id.* at p. 7, § 3(b).

11th, 2015.[38]  Section 3(a) and § 3(b) of the Second Amendment to the APA potentially require arbitration of two of the Trustee's claims.  The Trustee argues the Court retained jurisdiction on issues of contract interpretation, and that two "threshold legal issues" must first be determined by the Court before arbitration.[39]  Heritage argues that, regardless of how they are framed, these issues are "disputed items" subject to Accounting Arbitration and not to determination by this Court.[40]

<h2 style="text-align:center">DISCUSSION</h2>

### I.  Law Governing a Motion to Compel Arbitration

In the *Steelworkers Trilogy*,[41] the Supreme Court explained that the federal courts must follow four basic principles in determining whether a dispute is subject to arbitration.[42] First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[43]  Second, whether a dispute is covered by an arbitration clause and therefore must be submitted to an arbitrator "is undeniably an issue for judicial determination."[44]  Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims… even if it appears to be frivolous."[45]  Finally, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular

---

[38]  *Trustee's Complaint* at p. 1.

[39]  *Trustee's Response Brief* at p. 3.

[40]  *Heritage's Brief in Support* at ¶ 3-6.

[41]  *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); and *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

[42]  *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648 (1986) ("The principles necessary to decide this case are not new") (*citing Steelworkers Trilogy*).

[43]  *AT & T Techs.*, 475 U.S. at 648-49 (internal citations omitted).

[44]  *Id.* at 649 (internal citations omitted).

[45]  *Id.* at 649-50 (internal citations omitted).

grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."[46]  This principle is referred as the "presumption of arbitrability."

Subsequent cases have clarified that the presumption of arbitrability scales with the scope of the arbitration clause; a wide arbitration clause carries a substantial presumption of arbitrability, while a narrow arbitration clause carries a weak presumption of arbitrability.[47]  Moreover, "[w]here the clause is narrow, [a] collateral matter is generally not arbitrable."[48]

When dealing with an all-encompassing arbitration clause, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."[49]  Furthermore, when an arbitration clause "is not ambiguous and clearly delimits the issues subject to arbitration, the presumption of arbitrability does not apply."[50]  Finally, "there is a limit as to how far a court should go in resolving a dispute in favor of arbitration because… while interpretive disputes should be resolved in favor of arbitrability, a compelling case for non-arbitrability should not be trumped by a flicker of interpretive doubt."[51]

An arbitration clause is a contractual agreement between parties; therefore, the tools and rules of contractual interpretation are applied in interpreting an arbitration clause.[52]  However, evidence regarding the scope of an arbitration clause is not subject to the parole

---

[46]  *Id*. at 650 (internal citations and quotations omitted).  *See also First Liberty Inv. Grp. v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir. 1998).

[47]  *See* THOMAS H. OEHMKE, 1 Commercial Arbitration § 6.8, Westlaw (May 2016 Update).

[48]  *Id*. (*citing Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496 (6th Cir. 2011).

[49]  *AT & T Techs.*, 475 U.S. at 650 (*quoting Warrior & Gulf*, 363 U.S. at 584-585).

[50]  *Local 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc.*, 458 F.3d 305, 311 (3d Cir. 2006).

[51]  *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (*quoting PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 512 (3d Cir. 1990)).

[52]  *See* THOMAS H. OEHMKE, 1 Commercial Arbitration § 6:8, Westlaw (May 2016 Update) (*citing American Exp. Financial Advisors, Inc.* v. Makarewicz, 122 F.3d 936 (11th Cir. 1997)).

12

evidence rule and can come from the parties' bargaining history.[53]    The primary interpretative question posed by an arbitration clause is over it scope—what claims must be submitted to the arbitrator instead of the Court?    The Third Circuit has held that "to determine whether a claim falls within the scope of an arbitration agreement, the 'focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint.'"[54]

## II.    The Accounting Arbitration Clause Cannot Reasonably be Interpreted as Vesting the Arbitrator with the Power to Decide Issues of Contract Interpretation

The Trustee does not contest the validity of the Arbitration Clause nor does he assert that mandatory arbitration would be unconscionable or contrary to public policy.    As a result, the only question before the Court is whether the disputes between Heritage and the Trustee are within the scope of the Arbitration Clause.

The Court finds that the most reasonable interpretation of the Arbitration Clause is that it (1) is narrow in scope, (2) only compels arbitration of disputes solely arising under § 3(a) or § 3(b) of the Second Amendment and (3) only compels arbitration of accounting—not legal—disputes.    Three interpretative guideposts compel the Court to reach this interpretation.    First, the text and structure of the Arbitration Clause are largely unambiguous and require the Court to find the Arbitration Clause narrow in scope. Second, the Court finds that the most reasonable interpretation of the term "disputed items" incorporates the definition given to "item" in accounting, where it is a term of art referencing specific entries in an accounting ledger.    Third, in the Sale Order, this Court specifically retained the power to "interpret, apply and enforce" the APA.    As a result, the Court finds that the APA only mandates arbitration of accounting disputes. Finally,

---

[53]    *See AT & T Techs.*, 475 U.S. at 655 (J. Brennan, concurring).

[54]    *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (*quoting Svedala Indus., Inc.*, Civ. No. 96–4538, 1996 WL 590861, at *3 (E.D.Pa.1996)).

the Court believes this interpretation should be favored because it results in the Court and the Accounting Arbitrator adjudicating disputes within their realms of expertise.

**a. The Arbitration Clause only covers disputes under § 3(a) and § 3(b) of the Second Amendment.**

The Arbitration Clause reads as follows:

> "To the extent the parties are unable to come to a final resolution of the foregoing adjustments, the parties shall submit to a mutually acceptable 'big four' accounting firm for resolution any disputed items in accordance with the procedures (including allocation of fees and expenses) provided by such accounting firm."[55]

The first restriction on the scope of the Arbitration Clause is obvious: it only applies "to the extent the parties are unable to come to a final resolution of the foregoing adjustments."[56]  This pointer phrase limits arbitration to, at most, all disputes arising under the post-closing reconciliations required by § 3.3(a) and § 3.3(b).

**b. The Arbitration Clause cannot reasonably be interpreted to mandate arbitration of all disputes under § 3(a) and § 3(b) of the Second Amendment.**

The second restriction on the scope of the Arbitration Clause is not obvious at first glance, but is just as compelling.  The Arbitration Clause states that "the parties shall submit… for resolution *any disputed items*."[57]  The Arbitration Clause does not state that the parties shall submit for resolution "any *dispute*."

Heritage argues that the Court should interpret "any disputed items" synonymously with "any dispute."  In essence, Heritage urges the Court to find that the parties' use of the phrase "any disputed items" was a scrivener's error.  The Court finds this argument unreasonable.   Heritage, its co-Defendants and the Debtors were all sophisticated

---

[55] *Second Amendment to the APA* at pp. 6-7.

[56] *Id.*

[57] *Id.* (emphasis added).

commercial parties negotiating at arms-length.  This Court approved the numerous and substantial fee applications for a number of attorneys involved in the negotiation and drafting of the APA.  Because Heritage has not pointed to any extraneous evidence to inform the meaning of the Arbitration Clause, this Court assumes that the parties' use of specific language in the Arbitrational Clause was intentional and meaningful.

Heritage also argues that the term "any" requires the Court to interpret the Arbitration Clause broadly, but this argument doesn't hold any water.[58]  The Arbitration Clause does not specifically enumerate the disputes it covers,[59] but instead expresses its scope by using a general term — "any disputed items."[60]  By necessity, the parties' use of a general term *must* include the modifier "any."   A general term with a limiting modifier — i.e. "some disputed items" or "most disputed items" — would provide no interpretative guidance; the interpreter would have no logical method for distinguishing between disputes subject to arbitration and disputes not subject to arbitration.  Therefore, the Court finds that the use of the modifier "any" does not justify, nor even support, interpreting the Arbitration Clause broadly.

The Court believes that if the parties had intended to require arbitration of *any dispute* related to the required post-closing reconciliations, the text of the Arbitration Clause would have required the parties to submit "to [an]… accounting firm for resolution" "*any dispute*."  Instead, the parties agreed to submit "any disputed *items*."  The only reasonable interpretation is that "disputed items" is a sub-category of "disputes."   As a result, the Court reads the phrase "any disputed items" as a second restriction on the scope of the

---

[58]  *Heritage's Brief in Support* at p. 11.

[59]  By way of example, a specific-enumeration arbitration clause that could have been drafted here is "the parties shall submit to a mutually acceptable "big four" accounting firm any disputes over the Cash Amounts in Transit adjustment, the reconciliation of Check Amounts in Transit with Check Amounts in Transit Cash or the reconciliation of estimated Closing Cash with actual Closing Cash…"

[60]  *Second Amendment to the APA* at pp. 6-7.

Arbitration Clause. The Venn diagrams below illustrate the effect of the two narrowing provisions on the scope of the Arbitration Clause.[61]



**Court's Interpretation**

Interpretation and Enforcement of the APA

All Post-Closing Reconciliation Disputes

"Any Disputed Items"

**Heritage's Interpretation**

Interpretation and Enforcement of the APA

All Post-Closing Reconciliation Disputes = Any Disputed Items

**c.  "Disputed items" is a clear reference to disputes over accounting items.**

If "disputed items" is to be read as a restriction on the scope of the Arbitration Clause, however, there must be some method for the interpreter to distinguish between "disputed items," which must be submitted to the Accounting Arbitrator, and those disputes which are not subject to mandatory arbitration. The Court finds that the text of the Arbitration Clause does provide a basis for distinguishing between arbitrable and non-arbitrable disputes. The phrase "any disputed item" does not just limit the scope of the Arbitration Clause—the peculiar use of the term "item" provides a strong basis for interpreting the Arbitration Clause as only covering "accounting disputes."

The Court calls this term peculiar because "item" is not a term of art in contract or bankruptcy law. "Item" does not have a default meaning that is well known or well established among attorneys. Thus, it seems both peculiar that the parties chose to use

---

[61]  The Venn diagrams are not scaled for accuracy but for clarity of communication. If the diagrams were scaled for accuracy, "Interpretation and Enforcement of the APA" would obviously be far, far larger and "All Post-Closing Reconciliation Disputes" would be far smaller in comparison.

this term and peculiar that this term was not defined or further elaborated on in the APA. This usage, however, becomes far less peculiar when the context is taken into account: item is a term of art in accounting and this Arbitration Clause sends "disputed items" to an Accounting Arbitrator for resolution.

In the accounting field, "item" is a term of art meaning individual entries in a firm's ledger book.[62] "Itemization" is the process of breaking down a large summary term, such as "Firm A's Actual Outstanding Accounts Payable Obligations," into the individual "items" that are combined to create that large summary term.  Thus, when "item" is given the meaning it has as an accounting term of art, the text of the Arbitration Clause is clear — to the extent the parties dispute *specific accounting entries* they must submit their dispute to the Accounting Arbitrator for resolution.

### d. The Court's explicit retention in the Sale Order of power over interpretative disputes further supports a narrow interpretation of the Arbitration Clause.

Finally, this interpretation of the Arbitration Clause minimizes a nascent conflict with the Sale Order entered by this Court on July 14, 2014.  In the Sale Order, this Court expressly retained "jurisdiction to, among other things, *interpret, implement, and enforce* the terms and provisions of this Order and the Asset Purchase Agreement, *all amendments thereto*, any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchasers, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale or the Transaction."[63]  This retention of jurisdiction does not render the Accounting Arbitration Clause unenforceable; the Accounting Arbitration

---

[62]  *E.g.* "line item budget," "itemized expense report," "itemized tax deductions."  *See also Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, No. CV 9813-CB, 2015 WL 1897659, at *10 (Del. Ch. Apr. 24, 2015) (stating that "the word 'item' means '[a] single article or unit in a collection' or '[a]n entry in an account'") (*quoting* American Heritage Dictionary of the English Language 932 (5th ed. 2011)).

[63]  *Sale Order* at p. 40, ¶ 68.

Clause are validly agreed-to provisions of the APA that the Court must interpret and enforce.  Nonetheless, this paragraph of the Sale Order is significant for three reasons.

First, this retention of jurisdiction is explicit.  There is not silence on the other side of the Arbitration Clause, but instead an all-encompassing provision that explicitly states this Court has the power to interpret, implement and enforce the APA.  Second, the Sale Order, like most orders in a bankruptcy proceeding, was first drafted by the parties and then modified by the Court.[64]  Both drafts of the Sale Order included this provision.[65]  The Court's retention of jurisdiction is not a term imposed upon the parties by the Court, but a provision that the parties agreed upon as part and parcel of the Sale.  It must therefore be read in harmony with the Arbitration Clause.

Finally, the Court's interpretation of the Arbitration Clause renders the Arbitration Clause harmonious with the Sale Order.  The Court "interprets, implements and enforces" the APA.  The Accounting Arbitrator "resolves disputed items."  Put more plainly, the Court performs contractual interpretation while the Accounting Arbitrator determines the accuracy of the parties' records and calculations.  The Court's interpretation vitiates both provisions, renders them harmonious and results in both the Court and the Arbitrator operating within their realms of expertise.

## III.  The Issues of Contract Interpretation Highlighted by the Trustee are Not Within the Scope of the Arbitration Clause

Finally, the Court finds that the parties' current disputes are, at their core, disputes over the proper interpretation of the APA and not disputes over accounting items or methodology.  As a result, the motion to compel arbitration must be denied.

The parties' dispute regarding ACHE-R/D are plainly legal in nature and require only the interpretation of defined terms in the APA.  These issues do not involve accounting

---

[64]  *See Notice of Revised Proposed Sale Order*, D.I. 809, Ex. A; *Notice of Proposed Sale Order*, D.I. 607, Ex. A.

[65]  *Notice of Revised Proposed Sale Order* at p. 40, ¶ 68.  *Notice of Proposed Sale Order* at p. 36, ¶ 58.

calculations or accounting methodology and are plainly outside the scope of the Arbitration Clause in § 3(a) of the Second Amendment. Moreover, only one of the Trustee's claims to the ACEH-R/D involves interpretation of § 3(a) of the Second Amendment to the APA.

Second, the Court agrees with the Trustee and *Alliant* that the question of what accounting principles must be applied by the Accounting Arbitrator is clearly a threshold legal dispute. The disagreement between the parties over the calculation of Accounts Payable Obligations is clearly a dispute about the meaning of a provision in the APA. Therefore, this dispute is plainly outside the scope of the Arbitration Clause.

### a. Heritage clearly misunderstands the distinction between "disputes over accounting methodology" and disputes over contract interpretation.

In its briefs, Heritage repeatedly cites a recent decision, *Alliant Techsystems, Inc.* v. *MidOcean Bushnell Holdings, L.P.*, by the Court of Chancery of Delaware to support its position that all of the issues raised by the Trustee are arbitrable.[66] Heritage first cites *Alliant* for the proposition that "the parties would not have selected an 'independent accounting firm of national reputation' to serve as an 'expert' if all they wanted that firm to do was to engage in a bean-counting exercise."[67] The Court fully agrees with this statement by the Chancery Court. Heritage further quotes *Alliant* for the proposition that accounting arbitration provisions "permit accounting firms to settle disputes over accounting methodology when resolving purchase price adjustment disputes."[68] The Court, again, fully agrees with this statement by the Chancery Court.

---

[66] *E.g. Heritage's Brief in Support at* pp. 5, 12, 14, 15, 16. *See also Heritage's Reply Brief* at p. 9.

[67] *Id.* at ¶ 9 (*quoting Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, No. CV 9813-CB, 2015 WL 1897659, at *11 (Del. Ch. Apr. 24, 2015)).

[68] *Id.* (*quoting Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, No. CV 9813-CB, 2015 WL 1897659, at *10 (Del. Ch. Apr. 24, 2015)).

It is the conclusion prong of Heritage's syllogism that is flawed.  From these quotes, Heritage concludes that the Accounting Arbitrator should decide "whether credit card receivables should be treated as 'cash' or accounts receivable, and *whether* (and how) Generally Accepted Accounting Principles (or 'GAAP') applies to a variety of 'accounts payable' issues."[69]  Heritage's quotations of *Alliant* do not support such a conclusion and, in fact, *Alliant* directly and explicitly contradicts Heritage's urged outcome.

Heritage appears to have missed the first paragraph of the Chancery Court's analysis. "Apart from making the general observation that it is not unusual for parties to limit an accounting firm's role to applying *the same accounting principles used by a seller*, which *I find did not occur here for the reasons discussed above*, MidOcean advances two textual arguments that the parties never intended to have the Accounting Firm *resolve disputes over compliance with GAAP*."[70]  It is rare to see a party so heavily rely on a case that directly refutes their own position.

This Court is not an expert in the principles of any accounting methodology.  This Court does not, other than at a very broad level, know what the principles of GAAP accounting are.  The Trustee does not ask this Court to determine what the principles of GAAP are, nor how they should be applied.  The Trustee does not ask this Court to determine what accounting principles were used by the Sellers, nor how they should be applied.  And the Court should refuse to answer such questions if the Trustee asked; all of these questions are questions for the Accounting Arbitrator to decide.

What the Court is both competent and empowered to answer is whether the APA designated a specific accounting methodology be used in calculating Accounts Payable Obligations.  This is the issue raised by the Trustee: whether the APA requires the use of the same accounting principles used by the Sellers in the ordinary course of their

---

[69]   *Id.*

[70]   *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, No. CV 9813-CB, 2015 WL 1897659, at *10 (Del. Ch. Apr. 24, 2015) (emphasis added).

business.  And it was exactly this question that the Chancery Court in *Alliant* found was within its power to decide.

Finally, Heritage also repeatedly points out that there is no bar to an Accounting Arbitrator deciding issues of law.[71]  This is true.  But that fact does not weigh in favor of finding that the parties intended to have the Accounting Arbitrator decide issues outside her area of expertise.  When, as is the case here, the text of the Arbitration Clause clearly supports an interpretation that Accounting Arbitrator and the Court will resolve disputes within their areas of expertise, that interpretation should be favored.

**b.  The Court, not the Accounting Arbitrator, has the power to interpret the provisions of the APA.**

As the Court's analysis of the arbitrations provisions makes clear, the arbitration provisions of the Second Amendment are narrow and only require arbitration of accounting disputes.  Thus, to the extent that the parties dispute the meaning of a defined term in the APA, that dispute is non-arbitrable.  To the extent that the parties dispute the text of the APA, that dispute is non-arbitrable.

**1.  The Court, not the Accounting Arbitrator, has the power to determine whether ACHE-R/D are "Excluded Assets."**

This dispute, in its entirety, must be decided by the Court.  This dispute boils down to two questions of contractual interpretation.  First, does the definition of "Cash Amounts in Transit" in § 3(a) of the Second Amendment include ACHE-R/D?  Second, are ACHE-R/D a "cash or cash equivalent" and therefore an "Excluded Asset" retained by the Sellers in the Sale?  Neither of these questions involve accounting methodology or accounting calculations.  Only the first question even involves interpretation of § 3(a) of

---

[71]    *Heritage's Brief in Support* at pp. 5, ¶¶ 8-9.

the Second Amendment.  Therefore, there is no basis for compelling arbitration of these disputes.

### 2. The Court, not the Accounting Arbitrator, has the power to determine what accounting methodology, if any, is required by the APA in calculating Accounts Payable Obligations.

The parties' dispute over Accounts Payable Obligations can be broken down into three separate disagreements.  First, the parties dispute whether the Sellers' prepayments to vendors should be characterized as (1) a reduction against Accounts Payable Obligations or (2) an "Acquired Asset" purchased by Heritage in the Sale.[72]  Second, the parties dispute whether deposits made by customers of the Sellers should be treated as (1) a credit against accounts receivables or (2) Accounts Payable Obligations.[73]  Finally, the parties dispute whether Accounts Payable Obligations should include expenses "accrued" at the time of Closing.[74]

The Court understands the parties' positions on the merits as follows.  First, the Trustee asserts that when the parties defined "Accounts Payable Obligations" in the Second Amendment, that definition also specifically required that "Accounts Payable Obligations" be calculated using the accounting methodology used by the Sellers in their ordinary course of business.  Second, the Trustee asserts that the Sellers' long-standing accounting practice was: (1) to apply prepayments to Vendors as reductions against accounts payables; (2) to credit customer deposits against accounts receivables; and (3) to capture accrued expenses in ledger accounts beginning 23xxx or 24xxx.[75]  The Trustee asserts that were the Accounting Arbitrator to use these long-standing practices, she

---

[72] *Trustee's Complaint* at pp. 21-22, ¶ 66(b).

[73] *Id*.

[74] *Id*.

[75] *Trustee's Complaint* at ¶ 78.  The definition of Accounts Payable Obligations specifically covered only four general ledger accounts of the Sellers, all beginning 22xxx.  As a result, the Trustee asserts that accrued expenses cannot be included in the § 3(b) reconciliation process.

would fully agree with the Trustee's calculations.  In addition, the Trustee asserts that numerous other provisions of the APA allocate the value of dealer deposits and prepaid expenses to the sellers, and that the definition of Accounts Payable Obligations excludes accrued expenses.[76]

On the other hand, Heritage believes that GAAP accounting methodology must be used to calculate Accounts Payable Obligations.  Heritage believes that under GAAP accounting methodology: (1) prepayments to vendors are an asset; (2) customer deposits are accounts payable; and (3) accrued expenses are accounts payable.  Heritage believes that were the Accounting Arbitrator to use GAAP accounting methodology, she would fully agree with Heritage's calculations.

The Trustee has clearly presented a major threshold legal issue: which accounting methodology must be used to calculate Accounts Payable Obligations, the Seller's historical practices or GAAP?  The Trustee asserts that by defining Accounts Payable Obligations as "503 Liabilities accounted for in the Sellers books and records under the accounts 22100, 22180, 22181 and 22990," the APA clearly required that the Seller's historical accounting practices be used.  This is a legal question, relating solely to the meaning of the APA, and not an accounting question.  It must therefore be resolved by the Court.

c.  **The Accounting Arbitrator, not the Court, has the power to determine which party's calculations are consistent with the accounting methodology specified by the APA.**

Finally, the Court believes it important to note the restricted nature of the "threshold legal issues" it will decide.  With regards to the dispute over GAAP accounting, the

---

[76]  *Id*.  To summarize these arguments: (1) prepaid expenses and deposits were Excluded Assets under § 2.2(a)(xix) of the APA; (2) to the extent pre-paid expenses and deposits weren't Excluded Assets, they would be considered "'prepaid assets' related to an Excluded Liability; (3) dealer deposits were captured on general ledger account 22400, a ledger account not among the four specified in the Second Amendment; and (4) the definition of a 503 Liability under the Bankruptcy Code requires that the expense be "actual and necessary" and by definition, an accrued expense is not an "actual" expense.

Court's inquiry is merely into whether the APA requires either the Sellers' historical accounting methodologies or GAAP accounting methodologies be used in calculating the Accounts Payable Obligations.  It is up to the Accounting Arbitrator to determine *what those methodologies entail.*

Heritage repeatedly cites to *Campeau Corp. v. May Dept. Storces Co.*[77] in its briefs.[78]  In that case, the parties' agreement required that "'Working Capital…' [be] *calculated on the same basis as the Company's reported financial statements consistent with the Company's accounting policies and past practices as consistently applied.*"[79]  The district court found that each of the parties' disputes required a determination of *what the Company's accounting policies and past practices were.*[80]  As that Court explained, "[e]valuation of the parties' Schedule II calculations requires meticulous examination by experts into whether or not the parties departed from Federated's past accounting policies and practices."[81]

The Court's interpretation of the Arbitration Clause in the Second Amendment does not remove these questions from the Accounting Arbitrator.  For example, the Trustee asserts that it was the historical practice of the Sellers to apply prepayments to vendors as reductions against accounts payables and to credit customer deposits against accounts receivables.  Those questions are questions for the Accounting Arbitrator to decide. Heritage asserts that under GAAP accounting methodology, prepayments to vendors should be classified as an asset and customer deposits should be classified as accounts payable.  Those too, are questions for the Accounting Arbitrator to decide.

---

[77]   723 F. Supp. 224, 228 (S.D.N.Y. 1989).

[78]   *See Heritage's Brief in Support* at pp. 5, 14, 16. *See also Heritage's Reply Brief* at p. 10.

[79]   *Campeau Corp. v. May Dep't Stores Co.*, 723 F. Supp. 224, 227 (S.D.N.Y. 1989) (emphasis in original).

[80]   *Id.* at 228-29.

[81]   *Id.* at 228.

## CONCLUSION

The Court will deny Heritage's motion to arbitrate in its entirety.  The text and structure of the Arbitration Clause make clear that the Arbitration Clause is narrow in scope and only requires arbitration of accounting disputes.  Because the disputes raised by the Trustee are clearly disputes about interpreting the APA and defined terms within the APA, there is no basis for compelling arbitration of the Trustee's claims at this time.

Furthermore, none of the current disputes between the parties is actually a dispute over how an accounting method should be applied.  The parties' dispute over auction clearinghouse electronic receipts and deposits is entirely based on how defined terms in the APA should be interpreted.  Because this is entirely a legal dispute, it is not subject to mandatory arbitration.  Second, the parties' dispute over Accounts Payable Obligations boils down to a dispute over whether the APA requires the parties to use GAAP accounting methodology or the Sellers' historical accounting practices.  This, again, is a dispute on how the provisions of the APA should be interpreted.  If the Trustee succeeds in showing that the APA requires the use of the Sellers' historical accounting practices, it will be up to the Accounting Arbitrator to determine what the Sellers' historical practices were and whether the Trustee has correctly applied them.