IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>FBI WIND DOWN, INC. (f/k/a Furniture Brands Int'l, Inc.), *et al.*,<br><br>        Debtors. | ) Chapter 11<br>)<br>) Bank. No. 13-12329 (CSS)<br>)<br>) Adv. Pro. No. 15-51899 (CSS)<br>) |
| FBI WIND DOWN, INC. LIQUIDATING TRUST, by and through Alan D. Halperin, as Liquidating Trustee,<br><br>        Plaintiff/Appellee,<br>        v.<br><br>HERTIAGE HOME GROUP, LLC (f/k/a FBN Acquisition Holdings, LLC), *et al.*,<br><br>        Defendants/Appellants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civ. No. 16-834 (SLR)<br>)<br>)<br>)<br>)<br>) |

Michael J. Merchant, Esquire and Robert C. Maddox, Esquire, of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Appellants Heritage Home Group, LLC f/k/a FBN Acquisition Holdings, LLC, KPS Capital Partners, LP, KPS Special Situations Fund III, LP, KPS Special Situations Fund III (A), LP, KPS Special Situations Fund III (Supplemental), LP, KPS Special Situations Fund III (Supplemental – AIV), LP, and KPS Offshore Investors, Ltd.

Michael B. Schaedle, Esquire and Victoria A. Guilfoyle, Esquire, of Blank Rome LLP, Wilmington, Delaware. Counsel for Appellee FBI Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee.

**MEMORANDUM OPINION**

Dated: May 16, 2017
Wilmington, Delaware

ROBINSON, Senior District Judge

## I. INTRODUCTION

This is an appeal by Heritage Home Group, LLC, *et al.* (together, "HHG") from a bankruptcy court opinion (Adv. D.I. 41)[1] ("Opinion") and order (Adv. D.I. 42) ("Order") denying HHG's motion to compel the arbitration of several claims in an adversary proceeding. For the reasons that follow, the court will affirm the Order.

## II. BACKGROUND

### A. The APA and Sale Order

This appeal arises from the chapter 11 cases of Furniture Brands International, Inc. (together with its subsidiaries, "Debtors"). The following facts appear to be undisputed. The adversary proceeding arose out of the sale by Debtors of substantially all of their assets to HHG pursuant to an asset purchase agreement dated October 2, 2013 (as amended, the "APA") for a fixed price – approximately $280 million, plus HHG's assumption of certain liabilities.[2] (HHG8 at ¶ 27) Because certain of the assets and liabilities subject to the sale could not be immediately quantified and allocated on the date of the closing, the proposed sale of Debtors' businesses for a fixed price presented certain logistical problems, including two critical issues.[3]

***Cash and Cash Equivalents as Excluded Assets – APA § 3(a).*** First, HHG was acquiring Debtors' operations with the expectations that it was acquiring a "turnkey" business and that the proposed sale would proceed with no disruption in business

---

[1] *See FBI Wind Down Inc. v. Heritage Home Group, LLC, et al.*, Adv. Proc. No. 15-51899 (CSS) (Bankr. D. Del.). The docket of the adversary proceeding shall be referred to herein as "Adv. D.I. __."

[2] Citations to "HHG__" are to the Appendix filed in support of HHG's opening brief (D.I. 9).

[3] The bankruptcy court provided a detailed summary of these issues in its Opinion. (*See* HHG699-703).

operations. To ensure a seamless transition, the APA provided that HHG would acquire Debtors' infrastructure and cash management systems as part of the sale, including taking control of Debtors' physical bank accounts immediately following the closing of the sale on Monday, November 25, 2013, at 12:01 a.m. (*See* HHG74, § 2.1(a)(iv)) However, the APA also provided that Debtors would retain their "cash and cash equivalents," which assets were excluded from the sale ("Excluded Assets").[4] (HHG75-77, § 2.2) The parties anticipated that there would be millions of dollars in transit over the weekend prior to closing and that it would not be possible to quantify and allocate the value of the excluded cash and cash equivalents at the moment the sale closed on Monday morning. (HHG11-12, ¶ 41) Specifically, certain cash, bank deposits, wires, and checks in hand ("Cash Amounts in Transit") that were initiated, transmitted, received, or otherwise related to the activity of Debtors prior to the sale closing would not actually hit Debtors' cash management system until after that system came under HHG's exclusive control. (*See* HHG75-77, § 2.2(a)(x); HHG11-12, ¶ 41) Similarly, the APA provided that certain outstanding liabilities, including checks outstanding but not yet cleared, incurred by Debtors prior to the closing would remain obligations of Debtors post-closing, but those items also would not hit Debtors' cash management system until after that system came under HHG's exclusive control. (HHG12-13, ¶ 42) In an attempt to address these issues prior to closing, the parties entered into an amendment to the APA ("Amendment No. 2") and established an adjustment mechanism whereby the parties would estimate and then true-up post-closing the "cash and cash

---

[4] Among the "Excluded Assets" to be retained by Debtors were:
> [A]ll cash (including checking account balances, certificates of deposit and other time deposits and petty cash), other than Restricted Cash [(*i.e.*, cash reserved for the purpose of collateralizing letters of credit, cash received in respect of certain insurance recoveries, and certain other cash received on account of assets that all were sold to HHG)], and all cash and cash equivalents and marketable and other securities.

(HHG76, § 2.2(a)(x); HHG372, § 2(d))

equivalents." (See HHG375-76, § 3(a))  This was not a "purchase price adjustment" but rather a "cash component adjustment" meant to ensure that the aggregate purchase price remained fixed at $280,000,000.

**Accounts Payable Obligations – APA § 3(b).**  Second, the parties recognized the potential for significant post-closing disputes over what type of bankruptcy administrative (*i.e.*, post-petition) expenses constituted "trade payable obligations" under the APA, which obligations HHG had agreed to assume up to a certain cap (with any excess remaining the Debtors' obligation).  (HHG15-16, ¶¶ 48-51; HHG372, § 2(e))  These obligations also could not be immediately quantified and allocated between Debtors and HHG at the moment of the closing, given that business operations were continuing before, during, and after the sale.  In an attempt to address these issues prior to closing, Amendment No. 2 added the definition of "Accounts Payable Obligations."[5]  Similar to § 3(a), § 3(b) also contained an adjustment mechanism whereby the parties would estimate and then true-up post-closing all Accounts Payable Obligations.  (See HHG371-72 & 376, §§ 2(a), 2(e) & 3(b)))  Section 3(b), therefore, was designed to handle another difficulty in achieving a fixed purchase price at closing.

---

[5] The term "Accounts Payable Obligations" is defined in the APA as:
> The Sellers' accounts payable obligations incurred for the period prior to the Closing that are 503 Liabilities accounted for in the Sellers' books and records under the accounts 22100, 22180, 22181 and 22990 referenced on <u>Exhibit 2.3(a)(ii)</u> to this Amendment <u>plus</u> accounts payable obligations related to the purchase of goods or services incurred by the Sellers prior to the Closing (including accounts payable obligations for goods in transit for which title has passed to Sellers prior to the Closing) that are not captured in the aforementioned accounts; provided, that Accounts Payable Obligations do not include (i) any accounts payable obligations related to goods for which title passes after the Closing or services rendered on or after the Closing Date and (ii) for avoidance of doubt, any amounts already reflected in the Check Amounts in Transit (including, without limitation, all amounts in account 22300 referenced on Exhibit 2.3(a)(ii) to the extent so reflected) and accounts payable obligations of the Foreign Subsidiaries.

(HHG371, § 2(a) (amending APA § 1.1))

3

*Arbitration Provisions.* Sections 3(a) and 3(b) of Amendment No. 2 each include

an identical arbitration provision,[6] whereby the parties agreed that any "disputed items" not

mutually resolved in connection with the post-closing adjustments would be submitted to an

accounting firm for final resolution:

> To the extent the parties are unable to come to a final resolution of the
> foregoing adjustments, the parties shall submit to a mutually acceptable "big
> four" accounting firm for resolution **any disputed items** in accordance with
> the procedures (including allocation of fees and expenses) provided by such
> accounting firm.

(HHG375-76, §§ 3(a), 3(b) (emphasis added)) On November 22, 2013, the parties

executed Amendment No. 2 containing the adjustment mechanisms and arbitration

provision discussed above and, later that day, the bankruptcy court entered an order

approving the sale and "all of the terms and conditions" of the APA "in all respects."

(HHG403, § 4) ("Sale Order") The Sale Order further provided that the bankruptcy court

retained jurisdiction over issues of interpretation under the APA:

> The Court shall retain jurisdiction to, among other things, **interpret,**
> **implement, and enforce** the terms and provisions of this [Sale] Order and the
> [APA], all amendments thereto, any waivers and consents thereunder, and
> each of the agreements executed in connection therewith to which the Debtors
> are a party or which has been assigned by the Debtors to [HHG], and to
> adjudicate, if necessary, any and all disputes concerning or relating in any way
> to the Sale or Transaction.

(HHG429 at ¶ 68 (emphasis added)) Both the Sale Order and APA were heavily

negotiated and jointly proposed by the parties. (*See* HHG706-07; HHG710)

### B. Post-Closing Disputes

The sale closed on November 25, 2013. Thereafter, the parties attempted to

complete the post-closing adjustments required under Amendment No. 2 but were

---

[6] Because the arbitration provisions contained in § 3(a) and § 3(b) are identical, for
purposes of clarity and simplicity, the court refers to them herein in the singular.

ultimately unsuccessful with respect to reconciliation of Excluded Assets and Accounts Payable Obligations.

With respect to Excluded Assets, the parties dispute: (1) whether the definition of Cash Amounts in Transit in § 3(a) of Amendment No. 2 includes "Auction Clearing House Electronic Receipts and Deposits" ("ACHE-R/D") earned by Debtors shortly before closing; and (2) whether ACHE-R/D are "cash and cash equivalents" and, therefore, "Excluded Assets" retained by Debtors in the sale. (*See* HHG21, ¶ 66(a))  In short, Trustee[7] believes HHG's true-up and adjustment of Cash Amounts in Transit improperly omits ACHE-R/D that constitute cash and cash equivalents retained by Debtors.

Regarding Accounts Payable Obligations, the parties have several disputes.  First, the parties dispute whether Debtors' prepayments to vendors should be characterized as (1) a reduction against Accounts Payable Obligations, or (2) an "Acquired Asset" purchased by HHG in the sale.  (*See* HHG21-22, ¶ 66(b))  Second, the parties dispute whether deposits made by customers of Debtors should be treated as (1) a credit against accounts receivables, or (2) Accounts Payable Obligations.  (*See id.*)  Third, the parties dispute whether Accounts Payable Obligations should include expenses "accrued" at the time of closing.  (*See id.*)  With respect to the merits, the parties do not appear to dispute the bankruptcy court's understanding.  According to Trustee, the definition of Accounts Payable Obligations in Amendment No. 2 specifically requires a calculation applying the same accounting practices used by Debtors in their ordinary course of business, and that Debtors' long-standing accounting practice was (1) to apply prepayments to vendors as reductions against accounts payable, (2) to credit customer deposits against accounts receivables, and (3) to capture accrued expenses in ledger accounts beginning 23xxx or 24xxx.  (HHG25-27,

---

[7] Alan D. Halperin, as Liquidating Trustee ("Trustee") for the FBI Wind Down Inc. Liquidating Trust ("Liquidating Trust").

¶ 78)  Trustee asserts that were an arbitrator to apply Debtors' long-standing accounting practice, to which the post-closing mechanisms were meant to conform, the arbitrator would fully agree with Trustee's calculations.  Conversely, HHG believes that GAAP accounting principles must be used to calculate Accounts Payable Obligations, and that applying GAAP: (1) prepayments to vendors are an asset; (2) customer deposits are accounts payable; and (3) accrued expenses are accounts payable.  HHG asserts that were an arbitrator to apply GAAP accounting methodology, the arbitrator would fully agree with HHG's calculations.

### C. Adversary Proceeding

Under the arbitration provision, any disputed items that remain unresolved with respect to the post-closing adjustments must be submitted to arbitration.  (HHG 375-76)  Trustee took the position that, before arbitration of those disputed items may proceed, the bankruptcy court must decide two threshold issues of contract interpretation: (1) whether the APA's plain language should be interpreted to include ACHE-R/D as "cash and cash equivalents" that were "Excluded Assets" retained by Debtors, or as an "Acquired Asset" sold to HHG; and (2) whether the APA's plain language should be interpreted to include the concept of GAAP, by implication or otherwise, to the narrow definition of "Accounts Payable Obligations."  (*See* D.I. 10 at 17, 19-20; HHG39 at ¶ 109(a)-(d))  Trustee concedes that there may still be a need for arbitration before an accounting firm, but only after the bankruptcy court has resolved these "threshold legal issues" requiring interpretation of the APA.  (*See* HHG595)  Because interpretation of the APA was expressly reserved for the bankruptcy court's determination in the Sale Order, Trustee filed this adversary proceeding on November 11, 2015, seeking, *inter alia*, the bankruptcy court's adjudication of the threshold issues of interpretation.  (*See* HHG38-40)

6

### D. Motion to Compel Arbitration

Relying on the arbitration provisions set forth in the APA, HHG moved for an order compelling arbitration of all claims relating to the post-closing reconciliation disputes. (*See* HHG565-86) HHG argued that these disputes clearly fell within the scope of the APA's arbitration provisions, which covered "any disputed items" not resolved in connection with the post-closing adjustments. HHG argued that, regardless of how they are framed, these issues are "disputed items" subject to arbitration and not determination by the bankruptcy court. On July 7, 2016, the bankruptcy court heard extensive oral argument before taking the matter under advisement. (*See* HHG646-88)

On September 15, 2016, the bankruptcy court entered the comprehensive Opinion and Order determining that the core issues of the parties' dispute did not fall within the scope of the arbitration provision and denying HHG's motion to compel arbitration. (HHG693-718) Consistent with Third Circuit law construing the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), the bankruptcy court first examined the scope of the arbitration clause and then turned to the factual underpinnings of Trustee's claims to determine whether those claims fell within the scope of the arbitration provision.

In examining the scope of the arbitration provision, the bankruptcy court determined that its unambiguous text and structure required a finding that it was narrow in scope and applied only to the post-closing adjustments required by § 3(a) and § 3(b) of Amendment No. 2. (*See* HHG705-06) The bankruptcy court interpreted "disputed items" as a limitation on the scope of the provision, rejecting as "unreasonable" HHG's argument that "any disputed items" should be interpreted synonymously with "any dispute," and determining that the use of specific language by sophisticated commercial parties, negotiating at arms' length, was intentional and meaningful. (*See* HHG707) Because the arbitration clause "'states that 'the parties shall submit . . . for resolution **any disputed items**'" – and does

7

"not state that the parties shall submit for resolution '**any dispute**'" – the bankruptcy court

determined that the "only reasonable interpretation is that 'disputed items' is a sub-category

of 'disputes'" potentially arising under the post-closing reconciliation procedures. (*See id.*)

(emphasis in original)  The bankruptcy court further observed that, in "the accounting field,

'item' is a term of art meaning individual entries in a firm's ledger book," and use of this

language provided a strong basis for interpreting the arbitration provision as covering

accounting disputes; thus, "to the extent the parties dispute **specific accounting entries**

they must submit their dispute" to arbitration – which is consistent with Amendment No. 2's

specific reference to certain account balances in Debtors' general ledger and the overall

context of submitting post-closing price adjustment disputes to an accounting firm.

(HHG708-09) (emphasis in original)

The bankruptcy court noted that its interpretation rendered the arbitration provision

harmonious with the retention provision in the Sale Order, pursuant to which the parties

agreed that the bankruptcy court retained "jurisdiction to, among other things, **interpret,**

**implement, and enforce**" the terms and provisions of the Sale Order and APA "and **all**

**amendments thereto**…"  (*See* HHG710 (emphasis in original) (quoting HHG429, ¶ 68)).

The bankruptcy court determined that the arbitration provision was a "validly agreed to

provision of the APA" and that the language of the Sale Order was also significant for

several reasons.  (*See* HHG709-10)  The Sale Order's retention provision was not court-

imposed but rather drafted by the parties – "a provision that the parties agreed to as part

and parcel of the [s]ale" – and the provision was also explicit: "There is not silence on the

other side of the Arbitration Clause [with respect to interpretive issues], but instead an all-

encompassing provision that explicitly states the Court has the power to interpret,

implement and enforce the APA."  (HHG710)  The bankruptcy court declined to read a

conflict between the provisions of the APA and Sale Order, as HHG urged; rather, the

8

bankruptcy court chose an interpretation which "render[ed] the Arbitration Clause harmonious with [retention provision of] the Sale Order, such that the bankruptcy court "'performs contractual interpretation" and the "Accounting Arbitrator determines the accuracy of the parties' records and calculations." (*See id.*) This interpretation validates both provisions, giving effect to the plain language of the arbitration provision and also the parties' agreement that the bankruptcy court retain jurisdiction over any contract interpretation disputes. (*See id.*)

Having determined the scope of the arbitration provision, the bankruptcy court turned to a detailed and thorough analysis of the factual underpinnings of Trustee's claims to determine whether they fell within the scope of the provision. (*See* HHG710-16) The bankruptcy court explained that "[t]he parties' dispute regarding ACHE-R/D [is] plainly legal in nature and require[s] only the interpretation of defined terms in the APA." (HHG710) Similarly, the bankruptcy court further explained that "the question of what accounting principles must be applied by the Accounting Arbitrator is clearly a threshold legal dispute" and "[t]he disagreement between the parties over the calculation of Accounts Payable Obligations is clearly a dispute about the meaning of a provision in the APA." (HHG711) The bankruptcy court noted that, while an accounting arbitrator is not barred from deciding issues of law, that fact alone did not support a finding that the parties intended or agreed to have an accounting arbitrator decide issues of contract interpretation under the APA. (HHG713) Based on its analysis, the bankruptcy court determined that "[t]he parties' current disputes are, at their core, disputes over the proper interpretation of the APA and not disputes over accounting items or methodology." (HHG710) "Because the disputes raised by the Trustee are clearly disputes about interpreting the APA and defined terms within the APA," the bankruptcy court concluded there was "no basis for compelling

9

arbitration of Trustee's claims . . ." (HHG717), and denied HHG's motion to compel arbitration. (HHG718) HHG timely appealed the bankruptcy court's decision. (*See* D.I. 1)

## III. STANDARDS OF REVIEW

The court has mandatory jurisdiction over this appeal because the order is a final judgment of the bankruptcy court, 28 U.S.C. § 158(a)(1), and because that order denied a motion to compel arbitration and stay proceedings under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a).[8] The FAA mandates that district courts shall stay proceedings while arbitration is pending if a suit is brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" and the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement . . ." 9 U.S.C. § 3. The FAA limits the role of the court to a determination of: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the specific dispute falls within the substantive scope of the agreement. *John Hancock Mutual Life Ins. Co. v. Olick*, 151 F.3d 132, 136 (3d Cir. 1998). In conducting this review, the court should apply the ordinary principles of contract law. *See* 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Whether the dispute between Trustee and HHG is arbitrable turns on questions of contract construction and statutory interpretation, both questions of law over which the court exercises plenary review. *Brayman Const. Corp. v. Home Ins. Co.*, 319 F.3d 622, 624-25 (3d Cir. 2003); *see also Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) (contract construction); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1063 (3d Cir. 1992) (statutory interpretation).

---

[8] 9 U.S.C. § 16(a) provides for immediate appeals of orders denying motions to compel arbitration.

10

## IV. ISSUES RAISED ON APPEAL

HHG argues that, despite the APA's clear language submitting to arbitration "any disputed items" with respect to post-closing adjustments, the bankruptcy court misconstrued the arbitration provision as narrow, as applying only to accounting calculations, and as excluding threshold legal issues or issues of contract interpretation that the bankruptcy court considered as more appropriate for its realm of expertise. (*See* D.I. 8 at 19) By so holding, HHG argues that the bankruptcy court erred in at least four ways: (1) by ignoring the strong federal policy favoring arbitration; (2) by disregarding the clear language of the arbitration provision; (3) by improperly narrowing the scope of the arbitration provision on the premise that legal issues are better decided by a court than an accounting arbitrator; and (4) by misconstruing the bankruptcy court's general retention of jurisdiction as a limitation on the scope of the parties' agreement to arbitrate. (*See id.*) Trustee disputes HHG's characterizations of the bankruptcy court's ruling. According to Trustee, the bankruptcy court properly interpreted of the scope of the arbitration provision and correctly determined that the factual underpinnings of the parties' disputes were, at their core, issues of contract interpretation expressly reserved to the bankruptcy court under the Sale Order. (*See* D.I. 10 at 26, 35)

## V. DISCUSSION

### A. Whether the Bankruptcy Court Erred by Ignoring the Strong Federal Policy Favoring Arbitration?

#### 1. The bankruptcy court properly construed the scope of the arbitration provision and determined the factual underpinnings of the claims

HHG argues on appeal that the bankruptcy court's ruling ignored the strong federal policy conferring a presumption in favor of arbitration. (*See* D.I. 8 at 20-23) "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation*

11

*Co.*, 363 U.S. 574, 582 (1960). This axiom recognizes the fact that "[a]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit their grievances to arbitration." *AT&T*, 475 U.S. at 648-49. However, the FAA mandates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Battaglia v. McKendry,* 233 F.3d 720, 727 (3d Cir. 2000) ("[A]n agreement to arbitrate a particular dispute 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'") (quoting *AT&T Techs., Inc. v. Commcn's Workers of Am.*, 475 U.S. 643, 650 (1986)).

Although courts generally operate under this "presumption of arbitrability," *Battaglia,* 233 F.3d at 725, the Third Circuit has held that it does not apply in all circumstances. Rather, the presumption in favor of arbitrability applies only where the arbitration provision is broad or there is some ambiguity or doubt as to its scope. *See, e.g., Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 888 n.5 (3d Cir. 1992) (holding that when an arbitration provision is narrowly crafted, the court "cannot presume, as we might if it were drafted broadly, that the parties here agreed to submit all disputes to arbitration"); *Granite Rock Co. v. Int'l Broth. of Teamsters,* 561 U.S. 287, 288 (2010) (stating that presumption in favor of arbitrability arises "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand"); *Painewebber, Inc. v. Hofmann*, 984 F.2d 1372, 1377 (3d Cir. 1993) ("This presumption notwithstanding, a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt.") (internal quotations and citing reference omitted). The Third Circuit has further held that the presumption of arbitrability is inapposite where an arbitration clause

12

"clearly delimits the issues subject to arbitration." *Local 827 Int'l Broth. Of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc.*, 458 F.3d 305, 311 (3d Cir. 2006).

Here, the bankruptcy court determined that the "text and structure of the Arbitration Clause are largely unambiguous." (*See* HHG705) The court agrees that the arbitration provision is unambiguous, addressing "disputed items" that the parties are unable to resolve solely in connection with the post-closing adjustment procedures set forth in § 3(a) and § 3 (b) of Amendment No. 2. While the parties dispute the bankruptcy court's interpretation of this provision, they do not dispute that the language is unambiguous. (*See* D.I. 8 at 22; D.I. 10 at 29) "A contract is not ambiguous merely because the parties disagree about its proper interpretation." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005).

The court further concurs with the bankruptcy court's determination that the arbitration provision is narrow in scope. (HHG705) The "presumption [in favor of arbitrability] is particularly applicable when the [arbitration] clause is . . . broad" covering "any differences arising with respect to interpretation of [the] contract or the performance of any obligation thereunder." *AT&T Techs.*, 475 U.S. at 650. Broad arbitration provisions are generally defined as those that apply to "any dispute" or "all disputes" arising from an agreement. *See Trap Rock*, 982 F.2d at 888 n.5. Narrow arbitration provisions, on the other hand, have been found to "expressly limit the range of arbitrable disputes to a single category or function." *Id.* Clearly, the arbitration provision here does not apply to "any dispute"; rather, it appears only in § 3(a) and § 3(b) of Amendment No. 2, which specifically addresses the mechanics of post-closing adjustments with respect to excluded assets and liabilities that could not be precisely quantified and allocated at closing:

> To the extent the parties are unable to come to a final resolution of the foregoing adjustments, the parties shall submit to a mutually acceptable "big four" accounting firm for resolution any disputed items in accordance with the

13

>procedures (including allocation of fees and expenses) provided by such
>accounting firm.

(HHG18, ¶ 56; HHG375-76, §§ 3(a) and 3(b))  The arbitration clause thus applies only to

disputes arising in connection with the post-closing adjustments required under Amendment

No. 2, and then only to "disputed items."  Unlike clauses that direct parties to arbitrate any

and all matters arising from an agreement, the bankruptcy court noted that "this pointed

phrase limits arbitration to, **at most**, all disputes arising under the post-closing

reconciliations required by § 3(a) and § 3(b)."  (HHG706)  While the parties may disagree

about the meaning of the term "any disputed items" – specifically regarding whether that

term captures issues of interpretation under the APA – taken as a whole, the provision is

still narrow, as it "expressly limit[s] the range of arbitrable disputes to a single category or

function" – post-closing adjustments made in accordance with § [3(a)] and § [3(b)].  *See*

*Trap Rock*, 982 F.2d at 888 n.5.[9]  Based on the foregoing, it is clear to the court that the

arbitration provision was "narrowly crafted."  *See id.*  As the arbitration provision is neither

ambiguous nor broad, the bankruptcy court did not err by failing to apply a presumption of

arbitrability.

Finally, the court agrees with the bankruptcy court's determination that the parties'

disputes fall outside the scope of the arbitration provision, as the core of these disputes are

matters of contract interpretation.  In making this determination, the bankruptcy court was

required to look to the factual underpinnings of the claims, as opposed to the legal theories

asserted.  Reviewing the complaint, the parties' current dispute involves: (1) whether the

---

[9] Further supporting this classification is the Sale Order's broad retention provision that
reserves for the bankruptcy court power to "interpret, implement, and enforce" the terms of
APA. *See Compucom Sys., Inc. v. Gentronics Finance Holdings B.V.*, 635 F. Supp. 2d 371,
378 (D. Del. 2009) (asset purchase agreement directing accounting firm to resolve certain
disputes was to be construed narrowly in light of broader resolution clause requiring actions
to be brought in Delaware courts.)

14

APA should be interpreted to include ACHE-R/D as "cash and cash equivalents" that were an "Excluded Asset" retained by Debtors, or an "Acquired Asset" sold to HHG (HHG39, ¶ 109(a)); and (2) whether the APA should be interpreted to include the concept of GAAP by implication or otherwise in the definition of "Accounts Payable Obligations" (HHG39, ¶ 109(b)-(d)). The court finds no basis to disagree with the bankruptcy court's determination that these are not issues of how cash and cash equivalents should be calculated or how GAAP accounting principles should be applied, but rather issues of interpretation regarding defined terms in the APA.

### 2. The bankruptcy court was not required to compel arbitration of interpretive issues that "touch" the post-closing adjustment disputes

HHG argues that, to the extent the bankruptcy court relied upon Third Circuit holdings to the effect that a "presumption of arbitrability" does not apply to "narrow" as opposed to "broad" arbitration clauses, any such distinction is irrelevant here. (*See* D.I. 8 at 21) HHG argues that, under Third Circuit law, "[i]f the allegations underlying the claims 'touch matters' covered by [an arbitration clause in a contract], then those claims must be arbitrated, whatever the legal labels attached to them." (*Id.* at 21-22 (quoting *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003)) (internal citations omitted). HHG cites the Third Circuit's decision in *Brayman* in support of its argument that an accounting arbitrator – rather than the bankruptcy court – must interpret the APA's terms to the extent they in any way "touch upon" the post-closing adjustments under § 3(a) and § 3(b) of Amendment No. 2. (*Id.* at 22)

In holding that an insurer's alleged mishandling of a worker's compensation claim was covered by an arbitration provision in a separate retrospective premium agreement ("RPA"), despite the underlying insurance policy's silence as to arbitration, the Third Circuit in *Brayman* determined that the RPA's arbitration provision was "broad in scope, sweeping

into its reach '**any dispute** ... **between the Company and Insured** with reference to

interpretation of the [RPA], **or their rights with respect to any transaction involved**.'"

*Brayman*, 319 F.3d at 625 (emphasis added). The Third Circuit determined that although

the language "any transaction involved" was ambiguous, in light of federal policy favoring

arbitrability, any ambiguity should be resolved in favor of arbitration and the provision

interpreted to include "any business dealing relating, in whole or in part, to the RPA." *See*

*id.* at 625. Thus, the Court in *Brayman* rejected the insurer's argument that the bad faith

and breach of contract claims were not arbitrable because they arose under the policy,

rather than the RPA, determining this "does not necessarily preclude the conclusion that the

[insured's] claims also relate sufficiently to the RPA that they are swept into the RPA's

broad arbitration clause." *Id.* at 626 (relying on *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815

F.2d 840, 846 (2d Cir. 1987) (holding RICO claims and Robinson-Patman Act claims were

subject to arbitration provision in sales agreement: "If the allegations underlying the claims

'touch matters' covered by [an arbitration clause], then those claims must be arbitrated,

whatever the legal labels attached to them") (internal quotations omitted)).

HHG relies on *Brayman* in arguing that, because disputes over defined terms in the

APA not only "touch upon" but are well within the plain and natural language of the

arbitration provision concerning post-closing adjustments, those issues of interpretation

must be arbitrated as well. (*See* D.I. 8 at 22) The court declines to find issues of the APA's

interpretation are arbitrable because they may "touch" upon the adjustment disputes. First,

"[t]his theory admits no limiting principle." *See Shy v. Navistar Intern. Corp.*, 781 F.3d 820,

834 (6th Cir. 2015) (Clay, C.J., dissenting). If applied as a rule, any interpretive issue arising

under the APA could touch upon the ultimate adjustments of cash components required by

Amendment No. 2. Second, the parties expressly agreed that interpretive issues under the

APA would be decided by the bankruptcy court, whereas in *Brayman*, the Third Circuit

16

noted that the underlying policy included no language "incompatible with this cause of action being resolved in an arbitral forum," as "[t]he policy does not provide that it is to be enforced in court or specify a choice of forum." *Id.* at 626. *Brayman* is thus distinguishable from this case for a number of reasons, including its broad arbitration provision and the fact that the underlying Sale Order approving the APA includes express language specifying the forum for disputes over interpretation and enforcement. *Brayman* does not require a different outcome.

### 3. The parties' threshold disputes require interpretation of the APA, not application of accounting methodology

HHG further argues that "numerous courts have compelled arbitration before accounting firms, even where the arbitration clauses were 'narrow' in the sense that they covered only a specific type of contract dispute – that is, disputes as to adjustments to purchase prices – as opposed to 'all' disputes relating to a contract. The same result should apply here." (*See* D.I. 8 at 23 (citing cases)) HHG relies heavily on the *Alliant* case in support of its position. *See Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, 2015 WL 1897659 (Del. Ch. Apr. 24, 2015). In *Alliant*, a transaction agreement contemplated a post-closing working capital adjustment pursuant to which seller and buyer would exchange GAAP-compliant estimates and calculations, and any disputes would be resolved by an independent accountant. *See id.* at *4. Seller represented that its financial statements were GAAP-compliant, but buyer disputed whether certain items in seller's working capital estimate complied with GAAP. *See id.* at *1. Seller argued that buyer could not arbitrate GAAP compliance as part of the working capital adjustment and was required to seek a remedy for breach of representation under a separate indemnification provision. *See id.*

17

Delaware's Court of Chancery rejected seller's arguments that the accounting provision was limited to disputes over "items or amounts in Buyer's calculation . . . as to which Seller disagrees," that the arbitrator's determinations should be limited to "pure mathematics," and that the parties never intended for the accountant, which was designated as an expert rather than an arbitrator, to "resolve questions over the proper interpretation of GAAP." *Id.* at *10. The court determined that, even though "the dispute implicates issues concerning compliance with GAAP," such disputes were included in the dispute resolution process addressing "items or amounts." (*See id.* at *7, *10).

*Alliant* does not contradict the conclusion reached by the bankruptcy court, as the bankruptcy court also concluded that any dispute over **compliance with GAAP** (or another accounting methodology) would be a "disputed item" properly reserved for the accounting arbitrator under the language of the APA. (*See* HHG20 (clarifying that the accounting arbitrator, not the bankruptcy court, has the power to determine which party's calculations are consistent with the accounting methodology designated in the APA)). However, the issue of **whether GAAP applies** under the language of the APA – or whether the APA designated any specific accounting methodology – is a matter of contract interpretation, which the *Alliant* court also decided in the first instance. *See Alliant*, 2015 WL 1897659, at *1 ("the critical issue for the court to decide here is what the shared intentions of the contract parties were when they entered the Agreement"); *id.* at *11 (dispute raised issues of GAAP compliance and was arbitrable as parties did not intend to limit role of arbitrator to resolving questions of "pure mathematics"). Here, interpretive issues under the APA were also expressly reserved for the bankruptcy court under the Sale Order.

HHG cites other cases outside this circuit which do not support its argument or are otherwise distinguishable.[10] Perhaps the strongest support for HHG's argument is the Sixth Circuit decision in *Shy*. In that case, under a settlement agreement and consent decree resolving a class action lawsuit relating to employee benefits, Navistar made annual contributions to a trust managed by a Supplemental Benefit Committee ("SBC"). The size of the contributions was determined by a formula provided in the agreement, and Navistar was required to regularly provide certain data to SBC that would enable SBC to determine whether Navistar was applying the formula correctly and making contributions in the required amounts. *See Shy*, 781 F.3d at 822-23. The agreement provided for arbitration with an accounting firm in event SBC disputed the "information and calculation[s]" provided by Navistar. *Id.* at 823. A dispute arose regarding Navistar's alleged manipulation

---

[10] In *Seed Holding*, the parties "agreed to arbitrate only '[t]he determination . . . of the [a]ctual [w]orking [c]apital" and "[s]uch limitations on the scope of an arbitrator's role indicate a narrow clause for purposes of arbitrability analysis." *Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 583 (S.D.N.Y. 2014). While the court held that a determination of the proper accounting methodology fell within the scope of the arbitration provision, central to this ruling was the fact that the arbitration provision "impose[d] no explicit limits on the type of objections to the calculation of working capital that may be raised before the arbitrators . . . to the contrary, the provision calls for **'any dispute'** relating to the determination of actual closing working capital to be [arbitrated]." *Id.* at 583-84 (emphasis added).

In compelling arbitration of a dispute over parties' compliance with agreement's prescribed accounting methodology (as opposed to an interpretive issue of whether agreement specified accounting methodology), the *Tailwind* court noted that the agreement contained a narrow dispute resolution clause requiring the parties to "jointly engage Ernst & Young . . . to review and resolve exclusively **all of the unresolved Objections**" over post-closing adjustments. *Tailwind Mgmt. LP v. Akorn, Inc.*, 2015 WL 3884230, at *4 (S.D.N.Y. June 24, 2015) (emphasis added).

In *HBC*, the arbitration provision "vest[ed] the [a]ccountant with authority to determine 'whether the [f]inal [p]urchase [p]rice was calculated in conformity with the accounting principles' set forth in purchase agreement). *HBC Sols., Inc. v. Harris Corp.*, 2014 WL 6982921, at *2 (S.D.N.Y. Dec. 10, 2014). Thus, *HBC* also involved a dispute over compliance with an agreement's prescribed accounting methodology. Moreover, the agreement provided "without exception or limitation" that **"all issues"** raised in the relevant dispute notice must be decided by the arbitrator. *See id.* (emphasis added).

of its corporate structure and misclassification of aspects of its business in order to avoid its profit-sharing obligations. *See id.* at 824-25.

The Sixth Circuit found the arbitration clause "narrow," applying where "information or calculation[s]" provided by the corporation were disputed, but determined that the provision was not limited by its terms to disputes over "calculations" and could include business classification disputes "potentially involv[ing] questions of contract interpretation." *See id.* at 825. The Sixth Circuit observed that the "accountant-based" nature of the arbitration provision "at most creates some ambiguity as to whether the scope of the disputes over 'information and calculation[s]' was intended to be restricted to disputes in which no legal analysis whatsoever might be necessary." *Id.* at 825. However, the majority concluded that "the otherwise unqualified language of the agreement trumps any assumption that the parties would not have committed legal disputes to an accountant's resolution" and the ambiguity, if any, "must be resolved in favor of arbitration." *Id.* at 826.

*Shy* is distinguishable as the terms "information and calculation[s]" are of a broader scope than disputed "items" – especially reading the term "information" in the context of the parties' intent to confirm Navistar's financial information and enable SBC to enforce plan contributions. More importantly, the court disagrees with the majority's conclusion that the language of the arbitration provision was "otherwise unqualified." *See id.* at 825-26. As the dissent explained, "the recourse provided by [the arbitration provision] must be understood in context of the larger [agreement] and consent decree, which included . . . a provision in which the district court retained jurisdiction to 'resolve any disputes relating to or arising out of or in connection with the enforcement, **interpretation** or implementation' of the parties' agreement." *See id.* at 833 (Clay, C.J., dissenting) (emphasis in original).

### B. Whether the Bankruptcy Court Erred by Disregarding the Clear Language of the Arbitration Provision at Issue?

#### 1. The bankruptcy court properly applied principles of contract law

In determining whether a specific dispute falls within the scope of the agreement, the bankruptcy court was required to apply ordinary principles of contract law. *See* 9 U.S.C. § 2; *Kaplan*, 514 U.S. at 944. HHG argues that the bankruptcy court erred by disregarding the plain language of the unambiguous arbitration provision governing post-closing adjustments, which expressly covers the parties' disputes. (*See* D.I. 8 at 23-26) According to HHG, because the parties dispute the amounts of the Cash Amounts in Transit and Accounts Payable Obligations adjustments under § 3(a) and § 3(b) – and "specifically dispute whether certain amounts (or 'items') are to be included in the adjustments or not" – "the parties' disputes over those 'items,' and those 'adjustments,' are undoubtedly subject to arbitration." (*See id.* at 24) According to HHG, the arbitration clause's reference to "any disputed items" as to the "foregoing adjustments" is broad enough to cover the parties' disputes – even if they include matters of contract interpretation or accounting methodology. (*See id.* at 24-25)

As the bankruptcy court correctly observed, the essence of HHG's argument is that the court should have interpreted "any disputed items" synonymously with "any dispute." (HHG 706) However, in "ascertaining the shared intentions of the contracting parties when they entered into their agreement," the court must "give the words chosen by the parties their ordinary meaning." *Matria*, 2007 WL 763303, at *1. The bankruptcy court found it unreasonable to interpret "any disputed items" synonymously with "any disputes" in the context of submitting post-closing adjustment disputes to an accounting firm for arbitration. The court agrees that a synonymous interpretation of these terms is unreasonable, would fail to give effect to the term "items," and would require the court to ignore the language

21

chosen by "sophisticated commercial parties bargaining at arms-length." (HHG706) The
parties could have agreed to arbitrate "any dispute" arising under the post-closing
adjustment procedures, but they did not. Rather, the only reasonable interpretation is that
"any disputed items" is a sub-category of all "disputes" potentially arising from post-closing
adjustments.

### 2. The bankruptcy court did not improperly narrow the arbitration provision

HHG further argues that to reach its result, the bankruptcy court "engaged in a
strained and convoluted reading of the language of the [arbitration] claus[e]," and erred in
"misconstruing the scope of the term 'any disputed items.'" (See D.I. 8 at 30-32)
Specifically, HHG argues that the bankruptcy court misconstrued the word "any" as
surplusage and *sua sponte* considered and misconstrued the word "item" as narrowing the
arbitration provisions to cover only accounting calculations. (D.I. 8 at 32) Conversely,
Trustee argues that HHG spent considerable time before the bankruptcy court identifying
and explaining the import of the phrase "any disputed items" as one of limitation that covers
only individual "debits and credits" that remain in dispute, and that the parties properly
intended to put such disputed accounting entries before an accounting firm with expertise in
reviewing records of that type. (See D.I. 10 at 30-31; HHG668-83) Trustee argues that
HHG's suggestion that the bankruptcy court improperly construed "any" as a limiting
modifier, or that it *sua sponte* determined the word "item" to be an accounting term of art, is
incorrect, as both parties' briefs presented case law addressing the significance of this
language. (See D.I. 10 at 31) In its Opinion, the bankruptcy court reasoned:

> The Arbitration Clause does not specifically enumerate the disputes it
> covers,[11] but instead expresses its scope by using a general term – "any

---

[11] The bankruptcy court included the following footnote: "By way of example, a specific-
enumeration arbitration clause that could have been drafted here is "the parties shall submit
to a mutually acceptable 'big four' accounting firm any disputes over the Cash Amounts in

> disputed items." By necessity, the parties' use of a general term **must**
> include the modifier "any." A general term with a limiting modifier – i.e. "some
> disputed items" or "most disputed items" – would provide no interpretative
> guidance; the interpreter would have no logical method for distinguishing
> between disputes subject to arbitration and disputes not subject to arbitration.
> Therefore the Court finds that the use of the modifier "any" does not justify,
> nor even support, interpreting the Arbitration Clause broadly.

(HHG707) The bankruptcy court understood that the plain meaning of the term "any" is all-inclusive and expansive but must be read in the context of the particular phrase "any disputed items," which is different from a more broadly drafted arbitration provision covering "any disputes."

In giving the words chosen by the parties their ordinary meaning, the bankruptcy court determined that the most reasonable interpretation of the term "disputed items" incorporates the definition given to "item" in accounting. (HHG705) The bankruptcy court observed that "[i]n the accounting field, 'item' is a term of art meaning individual entries in a firm's ledger book," and determined that the word "item" in the context of Amendment No. 2 evinces a "clear reference to disputes over accounting items." (HHG708-09) On appeal, HHG labels this determination "puzzling" and argues that "there is a far more obvious, and natural, explanation for the use of the phrase 'any disputed items': to describe the specific adjustment amounts at issue and to exclude from arbitration any adjustments (or portions of those adjustments) that were **not** in dispute." (D.I. 8 at 32-33) The court does not see where an arbitration provision, intended to address disputes, would require language excluding items already resolved. The court finds the bankruptcy court's interpretation of "item" more logical in the context of the parties' agreement. As the bankruptcy court observed, the usage of this term makes sense when the context is taken into account: "item

---

Transit adjustment, the reconciliation of Check Amounts in Transit with Check Amounts in Transit Cash or the reconciliation of estimated Closing Cash with actual Closing Cash…". (HHG707 at n.59)

23

is a term of art in accounting, and the arbitration clause sends 'disputed items' to an accounting arbitrator for resolution." (HHG709)

The bankruptcy court's interpretation of "item" as an accounting entry finds support in one of the main cases relied on by HHG. *See Alliant,* 2015 WL 1897659, at *10 (stating that the word "items" means "a singular article or unit in a collection" or "an entry in account"). The *Alliant* court determined that the parties' compliance or non-compliance with GAAP methodology was an "item" that the accounting arbitrator should decide, but only after determining in the first instance that the parties must comply with GAAP principles under the operative agreement. *See Alliant,* 2015 WL 1897659, at *11 (discussing same). Just as in *Alliant,* the bankruptcy court here ruled that the interpretive issue of whether the APA designated a specific accounting methodology to be used in post-closing adjustments must be decided by the court, and clarified that disputes of over proper application of – or compliance with – that methodology were issues reserved to the accounting arbitrator. (*See* HHG716)

As the Trustee points out, other cases support the interpretation of "item" as an accounting entry. *See e.g., Medcom Holding Co. v. Baxter Travenol Lab.*, 1988 WL 107545, *4 (N.D. Ill. Oct. 13, 1988) (denying motion to compel arbitration for purchase price dispute arising under stock purchase agreement where "the arbitration clause is limited to objections concerning any 'account or item' . . . " and "[t]he language does not encompass all disputes arising out of the stock purchase agreement," as the "objections extend beyond mere challenges to an account or item on the closing balance sheet"); *Baumgart Holding Co. v. First Am. Corp.*, 2008 WL 2404748, *1 (M.D. Fla. Jun. 11, 2008) (denying motion to compel arbitration as the parties "agreed to arbitrate only a somewhat narrow scope of disputes" comprising disagreement on "any particular item or items or amount or amounts" subject to stock purchase agreement indemnification rights). The cases cited by HHG

24

compelling arbitration of disputes as "items" are distinguishable and do not compel a
different outcome.[13]

### C. Whether the Bankruptcy Court Erred by Improperly Narrowing the Scope of the Arbitration Provision on the Premise that "Legal Issues" Are Better Decided by a Court than an Accountant Arbitrator?

HHG argues that the bankruptcy court was required to rigorously enforce the

arbitration provision, but instead misconstrued the law by "presum[ing] that the parties

intended to exclude 'legal' issues from the arbitration of the [a]djustment disputes, absent

any express language to that effect in the arbitration claus[e]." (D.I. 8 at 28) According to

HHG, the bankruptcy court improperly narrowed the scope of the arbitration provision

"based on a fundamentally flawed premise: that the scope of an arbitration clause should

depend on a court's view of the appropriate 'realms of expertise' of a court versus an

arbitrator." (Id. at 17) HHG mischaracterizes the Opinion.

The bankruptcy court expressly acknowledged that there is no bar to an accounting

arbitrator deciding issues of law, including those of contract interpretation. (See HHG713)

Indeed, the correct question is not whether an accounting arbitrator is capable of deciding

issues of interpretation under the APA, but rather whether the parties intended to have an

accounting arbitrator decide issues of interpretation under the APA. See Campeau Corp. v.

May Dept. Stores Co., 723 F. Supp. 224, 228 (S.D.N.Y. 1989) (in determining whether a

dispute falls within the scope of an arbitration provision, "[t]he question, of course, is not

---

[13] See Matria, 2007 WL 763303, at *2, *6-*8 (compelling arbitration by settlement
accountant, as opposed to arbitrator, based on finding that disputes over "amounts or items"
included merits of pending dispute over customer claims based on finding that parties had
established an "**arbitration hierarchy**" in merger agreement that assigned responsibility to
settlement accountant as "the forum of express choice") (emphasis added); Severstal U.S.
Holdings, LLC v. RG Steel, LLC, 865 F. Supp. 2d 430, 434-36, 444 (S.D.N.Y. 2012)
(arbitration compelled to resolve disputes over "disputed contested adjustments" based on
finding that "the purchase price is ultimately a function of the **agreed upon calculation
methodology**" that did not relate to alleged misrepresentations made in financial
statements) (emphasis added); Shy, 781 F.3d at 822, 825-26.

who could best resolve the issue, but whether the parties agreed in their contract that an
arbitrator with appropriate expertise should do so."); *see also Alliant*, 2015 WL 1897659, at
*9.

Contrary to HHG's assertions, the Opinion reflects no presumption "that disputes
involving legal issues or contractual interpretation were excluded from arbitration." (D.I. 8 at
27) Although the bankruptcy court did make the observation that its decision would result in
the bankruptcy court and accounting arbitrator operating within their respective "realms of
expertise," the careful reasoning set forth in the Opinion reflects that the bankruptcy court's
determination was not driven by its purported views on a court's expertise versus that of an
accountant. Rather, the bankruptcy court construed the arbitration provision as required –
in the full context of the agreement and in accordance with ordinary principles of contract
law – and determined that the unambiguous language reflected the parties' intent to limit the
scope of the arbitration provision to "disputed items" and intent to reserve for the bankruptcy
court any issues of interpretation under the APA.

### D. Whether the Bankruptcy Court Erred by Misconstruing the Bankruptcy Court's Retention of Jurisdiction as a Limitation on the Scope of the Parties' Agreement to Arbitrate?

Finally, HHG argues that the bankruptcy court erred by misconstruing the general
retention of jurisdiction provision of the Sale Order as a limitation on the scope of the
parties' agreement to arbitrate. (D.I. 8 at 36) "Because [t]he Sale Order says nothing in its
general jurisdictional provision, or anywhere else, that would suggest any restriction on the
scope of the APA's arbitration [provision]," HHG argues that the bankruptcy court "erred in
concluding that the parties' disputes 'are issues over which the Court expressly retained
jurisdiction in the Sale Order.'" (*See id.* (citing HHG696)) The court disagrees that the
bankruptcy court endorsed any interpretation of the Sale Order's retention provision as a
"limitation." The bankruptcy court properly rejected HHG's argument that the Sale Order

had no bearing on the arbitration provision because such an interpretation would strip the parties' agreement of meaning. The Sale Order reflects the parties' express agreement that the bankruptcy court would resolve interpretive issues, and this agreement is valid and enforceable as both parties conceded. (*See* HHG652-54, 676-78, 709-10). The bankruptcy court was required by ordinary principles of contract law to give meaning to both provisions, if possible. *See e.g., In re G-I Holdings, Inc.*, 755 F.3d 195, 202 (3d Cir. 2014) (court should interpret contract in such a way as to not render any of its provisions illusory or meaningless). Thus, the proper construction was one that harmonized the Sale Order with the arbitration provision. (*See* HHG710)

HHG further argues that "where, as here, an arbitration clause is more specific than a general provision granting jurisdiction to a [b]ankruptcy [c]ourt, the arbitration clause controls." (D.I. 8 at 37) In support of this argument, HHG cites *DCV Holdings,* a case in which the Delaware Supreme Court affirmed a trial court's ruling that a buyer's claim for indemnification was governed by a provision of the purchase agreement that contained a knowledge qualifier, and thus indemnification was not available to the buyer. *See DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954 (Del. 2005). The Delaware Supreme Court cited "well settled rules of contract construction" including that "specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *See id.* at 961. The trial court's specific language is helpful: "where there is both a general and a specific provision **that pertains to the same subject**, courts ordinarily qualify the meaning of the general provision according to the meaning of the more specific provision." *DCV Holdings, Inc. v. ConAgra, Inc.*, 2005 WL 698133, at *12 (Del. Super. Mar. 24, 2005) (emphasis added). Assuming that the "general provision" here is the parties' agreement in the Sale Order that the bankruptcy court will interpret, implement, and enforce the terms of the APA,

27

it is not matched by a "specific provision" pertaining to the same subject of interpretation; rather, § 3(a) and § 3(b) provide mechanisms for post-closing adjustments and resolution of "disputed items" by an accounting firm and do not address issues of interpretation.

Moreover, contrary to HHG's arguments, there is no inherent conflict or inconsistency between these provisions. (*See* D.I. 8 at 37 (citing *In re Energy Future Holdings Corp.*, 539 B.R. 723, 727 (Bankr. D. Del. 2015) ("should there be an inconsistency between a specific and general provision of a contract, the specific controls"); *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 387 (Del. Ch. 2010) (finding that specific provision controlled over general provision to avoid rendering specific provision a "nullity")) The bankruptcy court was required to construe the contract as a whole, giving effect to the parties' intentions and, if possible, in a way that did not render any provision meaningless or illusory. The Sale Order reflects the parties' intention that the bankruptcy court address all matters of interpretation, implementation, and enforcement under the APA, and Amendment No. 2 reflects the parties' intent to apply mechanisms to make post-closing adjustments and resolve disputed items in those adjustments. The bankruptcy court properly rejected HHG's reading of the arbitration provision and Sale Order as conflicting and opted to read them in harmony, rendering them both with meaning and practical application. *See Trap Rock*, 982 F.2d at 889 (reading reservation clause and arbitration clause together and concluding that the "correct interpretatio[n] . . . is both consistent with its structure and [p]ermits of a practical application"). As there is no conflict between these provisions, which address different subjects, the cases cited by HHG do not compel a different result.

The bankruptcy court's decision is compelled by a straightforward reading of the arbitration provision. HHG does not meaningfully address the bankruptcy court's detailed findings as to the factual underpinnings of the parties' dispute regarding the post-closing adjustments, which at their core are disputes over the proper interpretation of the

28

contractual terms of the APA, not the application of accounting principles or calculations. The court finds no basis to disagree with those findings or the bankruptcy court's conclusion, which is consistent with ordinary principles of contract law and Third Circuit cases construing asset purchase agreements in the bankruptcy context. *See, e.g., In re Nortel Networks Corp.*, 445 B.R. 370, 373-74 (Bankr. D. Del. 2011) (exercising jurisdiction to decide issues of contract interpretation under asset purchase agreement as "dispute is not about calculating 'amounts'" but rather "the parties' intent regarding a material element of the Purchase Price Adjustment"). In light of the unambiguous language of the arbitration provision and the parties' express agreement in the Sale Order, the court cannot conclude that the parties intended for an arbitrator to determine issues of interpretation under the APA.

## VI. CONCLUSION

For the foregoing reasons, the bankruptcy court's Opinion and Order are affirmed, and HHG's appeal is denied. An appropriate order shall issue.